1-0-8-3-4-0-1 Metropolitan Water Reclamation Dist. v. Workers' Compensation Comm'n Council Good morning, Mr. Justices. My name is John Wilson. I represent the Metropolitan Water Reclamation Dist. of Greater Chicago in this case. Good morning. This is our appeal to reverse the decision of the Commission because it does not appear that they had the petition approved, entitlement to workers' compensation benefits by a preponderance of credible evidence in this case. As I read the record, I don't find any doctor's opinion or any real doctor's opinion that directly relates his current state of well-being and the things he testified about to his work incident of May 11th, 2004. Instead, it looks, excuse me, were you going to say something else? I wasn't asked. As a matter of law, does the claim have to, does the Commission's position have to rest on medical evidence? No, sir. As Mr. Powers stated in his other case this morning, I guess there's two ways of a petition approving this case. One is with medical evidence directly, medical opinion directly relating the current state of well-being to his work incident. The other one is that you can use the prior good health, the prior picture of good health that has been shown previously before the incident to after the accident. All right. It's interesting. Now you're going to use Mr. Powers' own words against Mr. Powers. And ironically enough, he could be on the other side of this. So it's nice that you cite your opposing counsel for an authoritative source. But you are correct. Prior good health, approval of good health prior to the time of an injury and subsequent condition of ill-being involving the area affected creates an issue of fact as to the causal connection between the injury and the condition of ill-being. And that's a matter of commission. So we have, as I'm reading the facts, the gentleman's working. There's an explosion. The substance gets on his eyes. He testifies he's never been the same. He had no problems before that. Now he has trouble with bright lights. The commission believed him. So I'm wondering where's the flaw here? First of all, that case that Petitioner relies on, I think, is Gould. Gould is not exactly what was the fact situation in Gould is not exactly what was stated in the briefs. In Gould, the appellate court stated that during this time, the doctor stated that the injured worker complains of back cramps, headaches, nervousness, and poor sleep persisted. And the objective condition occasioning the headaches and back complaints was that the doctor found, and I'm putting those words, was the doctor found are my words, was persistent muscle spasms in the muscles along both sides of the thoracic spine. So in Gould, you've got a doctor. You don't have just a picture of good health before the accident, the accident, and poor health. In Gould, what you have is actually medical opinion stating that, you know, I saw that he had muscle spasms on both sides of his thoracic spine, supporting the testimony of the Petitioner in that case. Now, what about this? In this case, didn't the treating doctor, the emergency room doctor, I think this might have been a referral, wasn't the diagnosis chemical burns to the eyes? Does anybody dispute that he had chemical burns to his eyes? And if not, isn't that some, quote, unquote, medical evidence? I would, I don't exactly know that he had chemical burns to the eyes, because if you look through the emergency room record, they did a litmus test to see if it was alkaline or acetic, and it came out 7, which is neutral. Well, you had the doctors at the Arbor Center for Eye Care. I mean, you're obviously aware of that. Yes, sir. The two doctors' initial diagnosis was chemical burns. Are you saying that wasn't their diagnosis? No. I'm saying that that's their working diagnosis. I don't, none of those doctors, well, I'm saying that's their working diagnosis. I three-quarters agree with your assessment of that, yes. All right. So how is that not relevant and supportive of the commission's decision? Well... I'm not trying to put you on a hot seat here. No. I'm trying to ask these questions. First of all, when the accident occurred, he was wearing goggles. Supposedly in the accident, the goggles were blown off, and supposedly some spray came onto his face. If you look at the emergency room record, the emergency room, although they treated both eyes, and you may be right, I can't remember exactly right now, they may have indicated chemical burns were indicated as a diagnosis in the emergency room. The only examination that was done or complaint was left eye. So it wasn't both eyes. It wasn't bilateral. It was just the left eye. Later when he goes to see one of the other doctors, there's a complaint of chemical burns, et cetera, et cetera, but it's like left eye greater than right. So he testified bilateral, but the doctor's opinion, the doctor's record states something else. I, it's, the medical presents a difficult, you know, a difficult situation in this case. One, because nobody's really familiar with the eye terminology either, and the second thing is that, you know, he's got this cataract. He gives us, he tries to give a picture of good health in this case, and he doesn't have a picture of good health. You know, he tells, he tells, I think, Dr. Parag, I think that's the doctor he sees on the first day of the accident. He comes in and says, I only have 20% acuity in my right, now it's the right eye, not the left, in the right eye due to my congenital cataract. So, I mean, he doesn't have a picture of good health in this, in this situation that he's trying to present to the commission. However, he was doing his job before the explosion and afterwards. He's doing his job now. Right. But he's doing his job. Does he not have special glasses, and isn't there some effect on his? I don't think he wears special glasses. I'm not sure he wears special glasses when he's well. I know he wears a welder's mask. And then, and then. I thought he could no longer weld because of his light sensitivity. No. I mean, I don't mean to disagree with you, but I would submit to you, Mr. Justice, that that was written by one, he came in and complained to a couple of his doctors. Dr. Kapusiak. He complained to him of light sensitivity four or five times when he came in, and Dr. Kapusiak, who was the regular treating physician, never limited his welding, knowing full well what he did for a living. He knew he was a welder. But the one time that he came in, and I think it was on January 12, 2005, that he saw Dr. Lubick, he complained to Dr. Lubick, who had not seen, I don't think had seen him before, who was standing in for Dr. Kapusiak, and he tells him, you know, I've got this sensitivity, you know, the welding was bothering me. So Dr. Kapusiak, Dr. Lubick, I'm sorry, excuse me, Dr. Lubick writes the note that says he shouldn't be welding, whatever the note said, he should be limited in his welding because he's got light sensitivity. That was on one occasion. His treating physician, the guy who regularly saw him, never made that a permanent restriction, never wrote that again, and never limited him in any fashion. I assume all that's true. Are you disputing that the claimant testified he can no longer weld because of the effect of the light emitted from the welding torch and his inability to follow the lines to make the necessary seams? Are you saying the claimant never testified to that? No, I'm not. All right. He did testify. I don't think that that's borne out by the medical evidence. I know that's what he testified, but I don't think the medical evidence supports that. Is there any contrary medical evidence to that assertion by the claimant? Yes. There is? Yes, I would say there is. And I would submit the fact that if you look, I think it's the Niles Police case, the Niles Police Department. What does the Niles Police have to do with medical evidence in this case? Well, what happened in that case, there was a sensitivity to light in that case. And what the doctor did is only one of you or two of you wear glasses. If you go in for a regular examination, maybe you wear contacts, I don't know. But if you go in for a regular eye checkup, you know that they have at least two instruments that they conduct, that they shine lights into your eyes with. And in those cases, if you have a sensitivity to light, under the Niles Police case, they submitted that there was excessive tearing, there was excessive blinking, he couldn't keep his eyes open during the exam. The doctor found objective evidence that he had photophobia. In this case, none of the doctors in here have noted it. All right. So there's a difference, though, is you're not at the split hairs. You're saying the doctors here didn't specifically support the claimant's testimony or his statement about his condition with testimony in the record, but they didn't testify that this is not true. Did they contradict the claimant in any way? Did any doctor contradict the claimant? Not overtly, not directly, but by silence they did. By silence? Well, sure. They conducted these eye exams every time he went in. And not one of these doctors notes that he's got excessive, he complains of excessive tearing, he complains of photophobia. Not one of these doctors notes that I had a problem conducting the exam because he had to close his eyes because he was blinking too much, because he was tearing too much, because he just couldn't take it. I caused a headache by doing this. So now we've gone full circle and we're back to Mr. Power's argument earlier this morning, are we not? Do you even need the medical evidence to support the commission's decision in this case? And the answer is, I think you admitted, is no. I think you do need medical evidence when the petitioner's story is not solid. The last thing I'd like to say is, if you disagree, and in the alternative, that we would suggest that although this court or any court, it would seem that we, and I apologize for citing those without explaining that, I didn't mean to do it like that. But the commission decisions in this case do not suggest that this case is worth 17.5 percent. We have submitted examples of, examples that we could find, Pomeres and Herrera, where in similar cases that the awards of the commission were 5 percent and 10 percent, and the case cited by the injured worker was Hamor. And in Hamor, the H-A-M-O-R, in Hamor there was the injured worker had blurred vision, conjunctivitis, headaches, and photophobia. He was also a carpenter, but because of the injuries that he suffered, he could not return to his job. He worked at a restaurant. He was making only $9 an hour. I would assume that a carpenter was making at least two or three times that at the time of trial, and that the petitioner, again, is incorrect. When you read Hamor, and it was cited to our reply brief, Hamor still testified that he had photophobia and these problems and conditions at the time of trial. So he still had it as opposed to being cured, which is, I think, what we were told. And he only received 15 percent loss of use of an eye. So I would suggest in this case that the 17.5 for each eye that he was awarded is much too great. Roberts. Okay. Counsel, your time is up. Thank you. Thank you. You may proceed. Mr. Carles, I hope you don't mind us discussing your arguments before you present them. No. And besides which, my arguments are the law. In my opinion, that's the law. You know, it's very simple. Mr. Mitchell or do I have to introduce myself again? Yes, please. For the record. For the record, my name is John Powers. I'm here on behalf of the appellee defendant, Michael Mitchell. Good morning, counsel. Good morning, Your Honors. The case is very simple. Mr. Mitchell was sprayed in the eye due to a broken valve, blew his goggles off. He was sprayed in the eye with sodium chloride, went to the emergency room. He had both eyes washed out. He received treatment thereafter. He developed not only a sensitivity to light, he also developed tearing as a result of the gas or the smoke coming from the welding as well. The commission in Paragraph 3 of their decision indicate or draw upon that as a basis for their award of benefits here, that it was limiting the duration of time that he could weld. As for the cases that the employers cited in their brief, the commission cases, you know, that, first of all, it's got no bearing on this court. The proper forum for that would have been at the commission level or, better yet, go hire an expert if their concern was that there's really no causal connection here, get an expert opinion saying there's no causal connection. The bottom line is this is really a nature-extinct case, and it's still a nature-extinct case, and that's what the employer would like for you to do. As far as not that it's necessary, but your opposing counsel is raising the issue, were there any objective tests done that support the claimant's subjective symptomology? Off the top of my head, I do not recall whether there was or was not. I apologize, Your Honor. But I would go back to my previous argument that, you know, the present condition of good being followed by a specific trauma, then a condition of ill being is enough to justify a reasonable person. I think that's in the record. I was just wondering if you can point to any other medical testimony or evidence to support that. No. Other than his own testimony that this has limited his vision in the sense that he requires sunglasses and bright light or smell, and while operating his welding torch, also develops problems holding the weld and the tearing of the eyes as well. So what's your understanding of the diagnoses of the doctors that did examine him? What did they determine his condition to be? That he has a chemical burn in the eyes. Okay. Kapustic, though, he had some opinions, didn't he? I'm sorry. He said there was no pathology to account for the photophobia. Right. He also said that although he gave him a workplace note saying that he should limit the time spent welding due to light sensitivity, the chart says that his opinion is that the defendant's or your client's sensitivity to welding may be due to smoke rather than light. Oh, when you weld, it produces smoke. Yeah. Right. But he never had that before this exposure. He was a welder long before this exposure, after the exposure. Was sensitivity to smoke photophobia? No. I don't think it is, is it? No. Well, it's a vision, doesn't it? Right. But what I'm saying is he was a welder long before this accident happened. Then, obviously, he had the accident. Now, you know, I would interpret that as being the smoke from the weld. I mean, if I'm the only person here who's ever in shop class in high school who's welded, you know, when you're welding the metal together, it does produce smoke. So that would account for the tearing in his eyes and then the duration of time when he could weld, as the commission pointed out. So, in essence, your argument would be proof of the good health, subject to the condition of ill-being. It's an issue of fact. It's the causal connection between that injury and the condition of ill-being, and conditions or issues of fact are to be resolved by the commission. Is that correct? Precisely. And there's no contrary evidence. Okay. Thank you. Thank you, counsel. Counsel, you may reply. I would submit to the court that in the commission's decision that they relied on facts that were not as they appear, they noted, like, I'm not sure if it was you or counsel, Mr. Justice, that in evidence there's a note from Dr. Lubeck limiting his time on welding. Again, the other, Dr. Kapusiak, never limited the time in the welding. That was the record time that saw the foundation for which they based their, the foundation upon which the decision of the commission was based was not built on a, they did not make the petitioner prove his case by a preponderance of the evidence. I think they just said, you know, you got hurt, you're claiming this, and we're going to go along with that. You talked about the welders, the smoke, and I'm not sure, but it very well could be that if he's welding, the smoke from the weld could cause photophobia. I don't know. I don't see why not. Counsel said, well, he was a welder for a long time. You don't get welders, everybody's familiar with welder's lung. I'm sure that you've had cases with that. You don't get welder's lung the first day on the job either. You know, it builds up tolerance after a while, and it occurs after a period of years. Just like carpal tunnel from typing or using the mouse, it doesn't happen the first two or three days on the job. It happens after a period of time, and I would submit that that could be a possibility of what happened here, especially when questioned by his doctors. I think the first doctor, Matt Judmer, he even questioned whether there was photophobia because he wrote down photophobia on his chart note and he put a question mark after it, and this is after he conducted the vision test and the light test on this individual. He questioned whether there was actually photophobia. Like I said, the other doctors are entirely silent as to whether or not there was objective evidence of photophobia, but you can be sure if there was, they would have put that down in their records and there isn't any. So I would respectfully disagree with your assessment that it's neutral. I don't think it is. I think it hasn't been proven by the petitioner. It's not in the records that if any of the doctors had noticed this at any of the times, they would have written this down in the records and that for the commission. So all of the argument when taken out to a sociable extension leaves the commission with assessing the believability and credibility of the claimant. Let's give you your due and you still have that in the record, do you not? And I would say that based upon the preponderance of the evidence, they did not make that assessment in the correct fashion, and it was against the preponderance of the evidence in this case. Yes. Thank you, counsel. Thank you for your argument on this matter. We'll be taking our advisement. This position shall issue. The court will stand in recess until 9 o'clock tomorrow morning.